IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HAYDEE MARTINEZ, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 2180 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| NORTHWESTERN UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Haydee Martinez filed a six-count complaint, alleging that her employer,

defendant Northwestern University ("Northwestern"), violated the Illinois Human Rights Act

("IHRA"), 775 ILCS 5/2-101 et seq., by harassing her on the basis of her sexual orientation

(Count I), discriminating against her on the basis of her pregnancy (Count II) and gender

(Count IV),[1] and retaliating against her for filing charges with the Illinois Department of Human

Rights ("IDHR") concerning the alleged discrimination (Counts III and V). Plaintiff's complaint

also alleges that defendant violated the Equal Pay Act, 29 U.S.C. § 206(d) (Count VI).

Defendant has filed the instant motion for summary judgment pursuant to Fed. R. Civ. P. 56,

contending that no genuine issue of material fact exists and that it is entitled to judgment as a

matter of law. For the reasons discussed below, the court grants defendant's motion.

---

[1] In her response brief, plaintiff states that she is no longer pursuing a claim for gender
discrimination. Accordingly, the court will not address Count IV.

Plaintiff, who is a lesbian, was hired by defendant in November 2001 as a police officer. Plaintiff's supervisors at the Northwestern Police Department ("NUPD") were aware of her sexual orientation at the time her employment commenced. In 2003, plaintiff began reporting to Sergeant Timothy Reuss, a heterosexual male, who was aware of her sexual orientation from at least the time he became her supervisor. Plaintiff alleges that from March 2003 to March 2011, Reuss often used the terms "fag," "faggot," "pussy," "cocksucker," and "sissy" in her presence when referring to offenders or students.

Plaintiff was promoted from a police officer to a sergeant on June 25, 2007. Consistent with the NUPD's salary plan,[3] which was implemented in 2005, plaintiff received a 10% raise at the time of her promotion, bringing her hourly pay to $31.03. Todd Collins, a heterosexual male, was also promoted from a police officer to sergeant on the same day as plaintiff. Collin's hourly pay as a police officer was lower than plaintiffs. Because a 10% salary increase would not raise Collins's hourly pay to the minimum salary rate for sergeants, Collin's hourly pay was increased to $29.96, the minimum starting hourly rate for a NUPD sergeant. In March 2011, plaintiff learned that her hourly pay was six cents higher than Collins's. Plaintiff complained to Deputy

---

[2] The following facts are, unless otherwise specified, undisputed and come from the parties' Local Rule 56.1 statements and responses.

[3] Under the NUPD salary plan, each rank has a salary range, with a minimum and maximum pay rate. Employees receive annual step increases on their anniversary dates starting on the date on which the 2005 salary plan went into effect. There are a total of six salary steps within each rank. "[A]n employee who is promoted to the next higher rank will receive a 10% increase of his or her current Service Step pay rate. If the 10% promotional increase does not bring the promoted employee up to their new rank's starting pay, the officer will receive the rank's higher starting pay." Exhibit 10 to plaintiff's deposition.

Chief of Police Daniel McAleer, a heterosexual male, that the pay differential between her and Collins's hourly rates should have been greater because she began with the police department four years before Collins. McAleer informed plaintiff that her compensation was consistent with the department's salary plan and that she had received a 26.65% total pay increase since her promotion to sergeant. As a sergeant, plaintiff received higher hourly pay than Collins every year until he left the NUPD in 2014.[4]

On September 2, 2011, plaintiff told Commander of Field Services Darren Davis, a heterosexual male, that she was not able to perform her regular work as a sergeant for at least two weeks due to a medical procedure[5] she was undergoing. Plaintiff provided Davis with a doctor's note, indicating that she needed to be on "light duty" and could not wear her duty belt or do any heavy lifting. On September 8, Davis informed plaintiff that she had been approved for light duty[6] work from September 9 through September 15, 2011. Although plaintiff did not work

---

[4] Despite testifying to such during her deposition, plaintiff now disputes that she was paid more than Collins while they were both serving as sergeants. In support of this position, plaintiff has submitted a declaration, executed nearly a year after her deposition, and a draft "Salary Plan Recommendation" that was generated by defendant during the discovery process. Plaintiff, however, "cannot create sham issues of fact with" a declaration that contradicts her prior deposition testimony. Lorillard Tobacco Co., Inc. v. A&E Oil, Inc., 503 F.3d 588, 592 (7th Cir. 2007) (overruled on other grounds). Because plaintiff unequivocally testified under oath that she was paid more than Collins during his employment with defendant, the court rejects plaintiff's attempt to create an issue to avoid summary judgment with a newly filed affidavit that contradicts her earlier testimony and an internal document that is clearly denoted as a draft. See e.g., Ineichen v. Ameritech, 410 F.3d 956, 963 (7th Cir. 2005).

[5] Plaintiff was undergoing fertility treatments at this time.

[6] The NUPD maintains a Temporary Modified-Duty Assignments Policy, which provides that "[t]emporary modified-duty assignments, when available, are for police officers and civilian personnel in this Department who, because of pregnancy, injury, illness or disability, are temporarily unable to perform their regular assignments but who are capable of performing alternative duty assignments." The policy states that the availability of modified duty

(continued...)

between the time she requested light duty work and the approval of her request, she did not lose any pay.[7]

On September 15, 2011, plaintiff told McAleer and Davis that she had undergone a surgical procedure the day before, could not work for the next two days, and would need to return to light duty status upon her return to work on September 20, 2011. Plaintiff was thereafter assigned to light duty work status. On October 11, 2011, plaintiff told Chief of Police Bruce Lewis, a heterosexual male, that she was pregnant and that she needed to continue on light duty status. Lewis approved her request for 30 days, allowing her to remain on light duty status until November 11, 2011. In his email approving her request, Lewis informed plaintiff that if she required more light duty work upon expiration of the 30 days she would need to provide additional information from her doctor. Lewis also stated that "because each light duty request will be considered on its own merits, [he] urge[d] that such request be made at least five business days before an anticipated decision." McAleer subsequently became responsible for coordinating plaintiff's light duty assignments.

McAleer informed plaintiff on November 10, 2011, that he did not have additional work to extend her light duty status beyond November 11, 2011. McAleer requested that plaintiff "follow through with the benefits division to utilize [her] leave time, disability options, or a

---

[6](...continued)
assignments are determined by the Chief of Police and that they are not guaranteed.

[7] Although it is undisputed that plaintiff did not lose any pay between when she requested light duty work and when the request was approved, plaintiff's declaration states, without any supporting documentation, that she was required to use one vacation day and one sick day in order to cover two of the days she did not work.

medical leave of absence." Plaintiff subsequently began applying for a medical leave of absence. On November 17, 2011, plaintiff lodged a complaint with the Acting Director of Northwestern's Office of Equal Opportunity and Access ("OEOA") about her light duty status not being extended. Plaintiff provided the OEOA with her medical notes and communications with the police department's administration concerning the light duty request.

After receiving plaintiff's request for a medical leave of absence on December 16, 2011, McAleer contacted plaintiff via telephone to inform her that the police department's light duty work had recently expanded in light of a project related to the Department of Homeland Security. McAleer informed plaintiff that the project, and corresponding light duty work, would likely begin in early January. The parties dispute whether McAleer told plaintiff that the project would last through the term of her pregnancy or only a few weeks or months. Plaintiff ultimately rejected the light duty assignment out of concern that if it did not last the length of her pregnancy, she did not have additional vacation or sick time from which she could be paid while her request for short-term medical leave was being re-processed. Plaintiff was approved for short-term medical leave on January 12, 2012, at 60% pay, retroactive to November 14, 2011, until she returned to work on September 1, 2012. This period included plaintiff's maternity leave from June 14, 2012, when she gave birth, to September 1, 2012.

During the summer,[8] plaintiff called Davis to ask about her shift assignment upon returning to work from maternity leave. Plaintiff was informed that she had been assigned to

_____

[8] The parties dispute whether plaintiff contacted Davis in late-July or August.

work an A, swing-shift for the 2012-2013 academic year.[9]  Although Davis distributed bid sheets

to lieutenants, supervisors, and police officers, on which they could indicate their preferred shift

assignment, Davis did not send plaintiff a bid sheet while she was on maternity leave.[10]

In order to help her re-acclimate to full-duty status, plaintiff was reassigned to the B-shift

(her preferred shift) for her first week back at work.  Plaintiff predominantly worked the B-shift

over the 2012-2013 school year.  Within the year, plaintiff worked a single A-shift, did not work

swing shifts at all in September, November, December, February, and August, and swung to a C-

shift only one to four times a month in October, January, May, June, and July.  Plaintiff was

assigned to a different shift beginning in September 2013.

Plaintiff filed three charges with the IDHR concerning her employment with defendant.

Plaintiff's first charge, filed on March 31, 2011, alleged discrimination based on her sexual

orientation as a lesbian.  On December 6, 2011, plaintiff filed a second charge with the IDHR,

alleging that defendant had discriminated against her based on her gender and pregnancy when it

denied her request for continued light duty work.  The charge also alleged that plaintiff had been

denied light duty work in retaliation for filing her earlier charge of discrimination.  Plaintiff's

third charge of discrimination with the IDHR, filed on August 3, 2012, alleged that her

assignment to the swing-shift for the 2012-2013 academic year was retaliatory and constituted

_____

[9]  NUPD staff are assigned to one of three shifts for the duration of each academic year. The A-shift is an overnight shift, the B-shift is a morning shift, and the C-shift is an afternoon shift.  A swing-shift is a shift given to sergeants that requires the sergeant to move between shifts to provide supervisory coverage.  Shift assignments are made annually, traditionally between April and June.  During the relevant time frame, Davis prepared the shift assignments for police officers, sergeants, and lieutenants, which were ultimately approved by Lewis.

[10]  The parties dispute whether Davis was aware of plaintiff's expected return date at the time he distributed the bid sheets.

gender discrimination. The charge also alleged that she was paid less than a similarly situated male employee.

## **DISCUSSION**

**1.    Legal Standard**

A movant is entitled to summary judgment pursuant to Fed. R. Civ. P. 56 when the moving papers and affidavits show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(c); Becker v. Tenenbaum–Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. See Green v. Carlson, 826 F.2d 647, 651 (7th Cir. 1987).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The nonmoving party must, however, "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

**2.      Analysis**

**A.      Illinois Human Rights Act – Counts I, II, III, & V**

The IHRA "is intended to secure for all individuals in Illinois freedom from unlawful

discrimination in connection with employment, real estate transactions, access to financial credit,

and availability of public accommodations."  Blount v. Stroud, 904 N.E.2d 1, 6 (Ill. 2009).

Pursuant to the IHRA,

> It is a civil rights violation . . . . For any employer to refuse to hire, to segregate, or
> to act with respect to recruitment, hiring, promotion, renewal of employment,
> selection for training or apprenticeship, discharge, discipline, tenure or terms,
> privileges or conditions of employment on the basis of unlawful discrimination or
> citizenship status.

775 ILCS 5/2-102(A).

The statute defines "unlawful discrimination" as "discrimination against a person because

of his or her race, color, religion, national origin, ancestry, age, sex, marital status, order of

protection status, disability, military status, sexual orientation, pregnancy, or unfavorable

discharge from military service."  775 ILCS 5/1-103(Q).

The IHRA also prohibits any employer or employee from engaging in sexual harassment.

775 ILCS 5/2-102(D).  Section 2-101(E) defines sexual harassment as, "any unwelcome sexual

advances or requests for sexual favors or any conduct of a sexual nature when . . . such conduct

has the purpose or effect of substantially interfering with an individual's work performance or

creating an intimidating, hostile or offensive working environment."  Pursuant to § 6-101(A) of

the state statute, it is also a civil rights violation to "[r]etaliate against a person because . . . he or

she has made a charge . . . under this Act."

Generally, "[i]n analyzing employment discrimination claims brought under the IHRA, Illinois courts 'have adopted the analytical framework set forth in United States Supreme Court decisions addressing claims brought under Title VII.'" Jeffrey v. Met Logistics, Inc., No. 07-CV-3301, 2009 WL 674349, at *13 (N.D. Ill. March 13, 2009) (quoting Zaderaka v. Illinois Human Rights Com'n, 545 N.E.2d 684, 687 (Ill. 1989)). Illinois courts have, likewise, found it appropriate to use federal case law analyzing discrimination cases under the IHRA. See, e.g., Robinson v. Village of Oak Park, 990 N.E.2d 251, 257 (Ill. App. Ct. 2013).

### i.  Hostile Work Environment – Count I

In her complaint, plaintiff alleges that Reuss harassed her based on her sexual orientation as a lesbian in violation of the IHRA. According to her complaint, this harassment consisted of Reuss's use of the words "fag," "faggot," "pussy," "cocksucker," and "sissy," comments he made to another gay officer concerning a sick day plaintiff had taken, and falsely altering one of plaintiff's time-sheets. Plaintiff clarifies in her response brief that "Count I is a hostile work environment claim, based upon plaintiff's sexual orientation." As articulated in plaintiff's response brief, Count I has also significantly evolved from what was alleged in the complaint. Plaintiff now argues that she was subject to a hostile work environment based not only on Reuss's actions, but also on Police Chief Lewis's actions.[11]

---

[11]  Specifically, plaintiff argues that her hostile work environment claim is based on: (1) "Reuss's pervasive use of homophobic slurs" from 2003 to March 2011; (2) "Reuss's petty attempts to 'poison the well' for [her] by passing on false, petty complaints to superiors, without ever discussing these issue with [her]," occurring as early as 2006; (3) "Reuss's attempts to create disciplinary problems for Plaintiff by entering false information on her timesheet"; (4) "Lewis's denial of [her request for] light duty"; (5) Lewis's "assignment of plaintiff to the swing shift"; and (6) Lewis's "refusal to recognize [her] and the officers working under her for work above and beyond the call of duty."

Plaintiff cannot, however, advance new grounds upon which her hostile work environment claim is based in response to defendant's motion for summary judgment. See e.g., Abuelyaman v. Ill. State Univ., 667 F.3d 800, 814 (7th Cir. 2011) ("It is well settled that a plaintiff may not advance a new argument in response to a summary judgment motion); see also E.E.O.C. v. Lee's Log Cabin, Inc., 546 F.3d 438, 443 (7th Cir. 2008) (holding that a response to a motion for summary judgment is too late to change a basic factual premise in the case). Plaintiff's complaint, which she has never sought leave to amend, and her charge with the IDHR allege that Reuss sexually harassed her, creating a hostile work environment. Accordingly, defendant had notice only that plaintiff's hostile work environment claim was grounded on Reuss' alleged harassment, not any actions Lewis took. See Lee's, 546 F.3d at 443 (quoting Twombly, 550 U.S. at 555) ("Federal pleading rules require the plaintiff to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"). Because this is "not a mere adjustment in the legal theory of the case," but instead "a major alteration of what the claim is and the ground upon which it rests," plaintiff cannot, at this late juncture, claim that Lewis also harassed her by assigning her to a swing shift, denying her light duty, and failing to recognize her team's performance. Id. (internal quotations omitted); see also Grayson v. O'Neill, 308 F.3d 808, 817 (7th Cir. 2002) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." (Internal quotations omitted)).

However, even if the court were to consider all of the alleged harassment discussed above, defendant is still entitled to judgment as a matter of law with respect to Count I because the IHRA does not provide a cause of action for a hostile work environment based on sexual

orientation harassment.  Section 2-102(D) of the IHRA prohibits sexual harassment, which is defined as "any unwelcomed sexual advances or requests for sexual favors or any conduct of a sexual nature when . . . such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment."  775 ILCS 5/2-101(E).  The conduct and actions plaintiff points to in support of her hostile work environment claim do not qualify as, nor does plaintiff argue that they are, "sexual advances," "requests for sexual favors," or "conduct of a sexual nature."  Because the plain language of the IHRA requires a hostile work environment claim to be based on sexual harassment, and plaintiff has not identified (or even pled) any evidence of sexual harassment, defendant's motion for summary judgment with respect to Count I is granted.

### ii.    Pregnancy Discrimination – Count II

Count II of plaintiff's complaint alleges that defendant discriminated against her based on her pregnancy by failing to provide her with light duty work for the duration of her pregnancy. As discussed above, it is undisputed that defendant initially granted plaintiff's request for light duty work, and that plaintiff was assigned to light duty status from September 9 through November 10, 2011.  At the time plaintiff was approved for an additional 30-days of light duty work to accommodate her pregnancy, she was informed that a request for further light duty work would be considered on its own merits.  On November 10, 2011, McAleer informed plaintiff that there was no additional light duty work for plaintiff to complete.  However, prior to signing plaintiff's request for short-term medical leave, McAleer contacted plaintiff to inform her that additional light duty work would be available beginning in January 2012.  Plaintiff denied

McAleer's offer for additional light duty work, opting to take short-term medical leave for the remainder of her pregnancy.

Section 2-102(I) of the IHRA provides that it is a civil rights violation:

For an employer to refuse to hire, to segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of pregnancy, childbirth, or medical or common conditions related to pregnancy or childbirth.

A plaintiff may pursue a discrimination claim pursuant to § 2-102(I) through either the direct or indirect method. Silverman v. Board of Educ. of City of Chicago, 637 F.3d 729, 733 (7th Cir. 2011). Plaintiff appears to have elected to proceed under the indirect method. To do so, plaintiff must initially establish a prima facie case of discrimination by offering evidence that: (1) she is a member of a protected class; (2) she met her employer's legitimate work expectations; (3) she suffered an adverse employment action; and (4) another similarly situated non-pregnant employee was treated more favorably. See Coleman v. Donahoe, 667 F.3d 835, 845 (7th Cir. 2012). If plaintiff establishes these elements, the burden shifts to the defendant to provide a non-invidious reason for the adverse action. Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1038-39 (7th Cir. 1998). If a legitimate reason is produced, plaintiff must then prove that the reason was pretextual. Id. at 1039.

The parties dispute whether defendant's denial of plaintiff's request for additional light duty work in November 2011 qualifies as an adverse employment action. The court, however, need not address this issue because plaintiff has failed to establish that another similarly situated non-pregnant employee was treated more favorably. Similarly situated employees "must be directly comparable to the plaintiff in all material aspects, but they need not be identical in every

conceivable way." <u>Coleman</u>, 667 F.3d at 846 (internal quotations omitted). "In the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" <u>Coleman</u>, 667 F.3d at 847 (quoting <u>Gates v. Caterpillar, Inc.</u>, 513 F.3d 680, 690 (7th Cir. 2008)).

None of the individuals plaintiff relies on are adequate comparators. As an initial matter, Lisa Jackson cannot serve as a comparator because she is a part of plaintiff's protected class. In fact, Jackson cuts against plaintiff's pregnancy discrimination claim because she was given light duty work while pregnant. Similarly, Thomas Roberts and Officer Kramarz are not adequate comparators because they did not engage in similar conduct as plaintiff. Unlike plaintiff, Roberts did not request light duty work but fulfilled his normal work duties with restrictions on overtime work as an accommodation pursuant to the American with Disabilities Act. Officer Kramarz, likewise, was not placed on light duty status as the result of some short-term medical issue, but instead was reassigned to do investigatory work because of department needs.

Robert Cook is also an inadequate comparator because he was given a single light duty assignment more than 20 years ago when he was a police officer, not a sergeant, which was approved by a different Chief of Police. Moreover, Cook also testified that he was denied every other request for light duty work. Although Wesley Jackson and Sergeant Reuss serve as better comparators, neither are sufficient to establish that other similarly situated, non-pregnant employees were treated more favorably than plaintiff. Jackson was a police officer at the time he was given a light duty assignment, and therefore was not subject to the same standards as

plaintiff, who is a sergeant. Even assuming, however, that Jackson shared the same position as plaintiff, plaintiff has not alleged or established that Jackson was given more light duty work than she was or that Jackson made a request for additional light duty work that was granted. Because plaintiff was in fact granted over two months of light work, a comparator cannot simply be a NUPD employee who received light duty work.

Reuss fails as a comparator for these same reasons; plaintiff has not established that Reuss was a sergeant at the time he was granted light duty work for an injury to his rotator cuff, nor that Reuss was given more light duty work than plaintiff. In fact, the record suggests that plaintiff was approved for light duty work for at least as long, if not longer, than Reuss's six to eight weeks of light duty status. Because plaintiff has failed to establish a prima facie case of discrimination, Count II of her complaint fails as a matter of law.

### iii. Retaliation – Counts III & V

Counts III and V of plaintiff's complaint allege that defendant retaliated against her for filing charges with the IDHR. According to plaintiff, the alleged retaliation consisted of: "(1) the denial of a light duty assignment in 2011-12 during her pregnancy; (2) the assignment to swing shift following her return from pregnancy leave; (3) Reuss's repeated attempts to create disciplinary problems for plaintiff through improperly accessing plaintiff's timesheet and making false reports about plaintiff to the command staff; [and] (4) [d]enying plaintiff and her team recognition for a job well done in 2013."

As with a discrimination claim, a plaintiff may pursue a retaliation claim by presenting either direct or indirect evidence. Boumedhi v. Plastag Holdings, LLC, 489 F.3d 781, 792 (7th Cir. 2007). In her response brief, plaintiff indicates that she wishes to proceed under the direct

method.  Under this method, plaintiff must show that: "(1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) [that] there is a causal link between the protected activity and the adverse action."  Parkins, 163 F.3d at 1038.  The parties do not dispute that plaintiff engaged in statutorily protected activities when she filed charges of discrimination with the IDHR on March 31, 2011, December 6, 2011, and August 3, 3012.  See 775 ILCS 5/6-101(A).  Defendant, however, argues that plaintiff's claims of retaliation fail as a matter of law because she cannot establish the second and third elements of her prima facie case.[12]

Defendant first argues that the alleged retaliatory acts do not qualify as adverse employment actions.  "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006); see also Stephens v. Erickson, 569 F.3d 779, 790 (7th Cir. 2009) ("Not everything that makes an employee unhappy is an actionable adverse action." (internal quotations omitted)).  Consequently, an adverse employment action must be materially adverse, meaning "it might dissuade a reasonable worker from making or supporting a charge of discrimination."  Brown v. Advocate South Suburban Hosp., 700 F.3d 1101, 1106-07 (7th Cir. 2012).

Plaintiff identifies four occasions on which Reuss allegedly tried to create disciplinary problems for her in retaliation for having filed the March 31, 2011, charge with the IDHR,

_____

[12]  In her response brief, plaintiff fails to respond to defendant's arguments concerning whether the alleged retaliation constituted adverse employment actions, arguing instead that "[t]he only dispute between the parties is whether plaintiff can show a causal connection between the protected conduct and the many actions taken against plaintiff."

accusing Reuss of discrimination. Plaintiff complains that: (1) on December 22, 2012, Reuss emailed McAleer falsely accusing her of engaging in juvenile and unprofessional behavior during an event roll-call; (2) on December 24, 2012, and January 5, 2013, Reuss emailed Lieutenant Parashis about plaintiff not filling up her vehicle's gas tank during her shift; and (3) in October 2014 Reuss entered false information on her time-sheet.

None of these incidents, however, constitute a materially adverse employment action. Plaintiff has not identified, nor can the court discern, how Reuss's three emails to plaintiff's supervisor's had any actual consequences for her, and therefore cannot be considered materially adverse or even adverse. See Brown, 700 F.3d at 1108-09 (holding that because a negative review did not have any actual consequences for plaintiff it was not materially adverse); see also Bowden v. Kirkland & Ellis LLP, No. 07-C-975, 2010 WL 3526483, at *15 (N.D. Ill. Sept. 3, 2010) ("Negative evaluations or criticisms that do not result in tangible job consequences are not actionable."). Reuss's emails, at most, constitute "petty slights or minor annoyances that often take place at work and that all employees experience." White, 548 U.S. at 68.

Nor did Reuss's alteration of plaintiff's time-sheet, whether intentional or unintentional, have any actual consequences for plaintiff. Plaintiff promptly learned that Reuss had altered her time-sheet and filed a formal internal complaint, after which defendant launched an investigation into the incident. Moreover, the fact that plaintiff immediately complained about Reuss's actions demonstrate that the alleged retaliatory act did not dissuade her from engaging in protected activity. See, e.g., Bowden, 2010 WL 3526483 at *15 (holding that alleged retaliatory action was not an adverse employment action because the plaintiff filed a charge with the EEOC

several days after, and therefore was not dissuaded from engaging in further statutorily protected activity).

Similarly, Police Chief Lewis's failure to award plaintiff and her team a merit award for work they did related to a garage fire does not constitute a materially adverse employment action. Plaintiff has not provided any evidence that the award would have resulted in financial benefit or led to a promotion or any other benefit. See, e.g., Trimble v. Alliance-DeKalb/Rock-Tenn Co., 801 F. Supp.2d 764, 775 (N.D. Ill. 2011). Without such evidence, the court cannot discern how not receiving a merit award would dissuade a reasonable employee from filing a charge in the future.

Even assuming *arguendo* that these incidents were adverse employment actions, plaintiff has failed to point to any causal connection between them and her statutorily protected activity. Plaintiff merely states that she filed her first charge of discrimination in March 2011, and "[t]hereafter, the department command staff, Lewis, McAleer, Davis, and Reuss, started to retaliate." Timing alone, however, rarely creates an issue of fact. Nehan v. Tootsie Roll Indus., Inc., 621 Fed. Appx. 847, 852 (7th Cir. 2015); see also O'Leary v. Accretive Health, Inc., 657 F.3d 625, 635 (7th Cir. 2011) ("[T]emporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter."). Nearly two years passed between plaintiff filing her charge against Reuss in March 2011 and Reuss's alleged retaliatory actions in December 2012. Another two-plus years then passed between plaintiff filing the August 2012 charge related to her swing-shift assignment and Lewis's failure to recognize plaintiff and her team for their work performance in September 2014. With such a large gap of time between plaintiff's protected activity and the alleged

retaliation, "additional proof of a causal nexus is necessary" to overcome defendant's motion. Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 511 (7th Cir. 1998); see also O'Leary, 657 F.3d at 635 (two month gap between protected activity and adverse employment action "not strongly suggestive of retaliation").

Plaintiff further argues that defendant assigned her to a swing-shift for the 2012-2013 school year in retaliation for her charges of discrimination. According to plaintiff, her assignment to a swing-shift, even though she rarely had to swing shifts, adversely affected her because she "did not know her schedule going forward, and therefore had a limited ability to make personal plans." Plaintiff contends that as a new mother, this uncertainty negatively impacted her life.

The Seventh Circuit has recognized that "[b]y and large a reassignment that does not affect pay or promotion opportunities lacks" the potential to dissuade a reasonable employee from making or supporting a charge of discrimination. Washington v. Ill. Dept. of Revenue, 420 F.3d 658, 662 (7th Cir. 2005). As plaintiff points out, however, the Supreme Court has held that when determining whether an employment action is materially adverse, context matters. White, 548 U.S. at 69. Although a swing-shift assignment that resulted in swinging between relatively few shifts may not have been a materially adverse employment action for many employees, plaintiff's circumstances were different than the average employee. Because plaintiff had previously had issues with a swing-shift assignment and had recently given birth at the time she began her 2012-2013 swing-shift assignment, facts defendant was aware of when assigning her to a swing-shift, a jury could find that the assignment was a materially adverse employment action. See Washington, 420 F.3d at 662-663 (holding that assignment to new shift that did not

allow for a flex-time schedule was a materially adverse employment action for plaintiff who cared for a disabled son).

Plaintiff, however, has failed to establish that there was any connection between her assignment to a swing-shift and a statutorily protected act. Again, plaintiff appears to rely only on suspicious timing in attempting to create a connection between her charges of discrimination and her assignment to a swing-shift. At the time plaintiff was assigned to a swing-shift in the Spring of 2012, her most recent charge of discrimination was filed on December 6, 2011. Accordingly, approximately four to six months had passed between her statutorily protected activity and her swing-shift assignment. As discussed above, timing alone rarely creates an issue of fact, and where at least four to six months passed between the protected activity and the alleged retaliatory act, additional proof of a nexus is required. Davidson, 133 F.3d at 511. Plaintiff discusses the fact that Davis failed to send her a bid sheet on which she could have indicated her shift preference, but this does not establish a causal connection between her protected activity and swing-shift assignment.

Finally, plaintiff alleges that she was denied continuous light duty work for the length of her pregnancy in retaliation for her March 2011 charge of discrimination. Again, assuming that defendant's denial of plaintiff's request for continued light work was an adverse employment action, plaintiff has not pointed to any evidence that establishes a causal connection between a protected activity and defendant's denial of her request. The fact that her initial request for light duty work took a few days to approve and that their may have been miscommunication concerning how long the Department of Homeland Security project may last, do not establish any such connection. Given that defendant provided plaintiff with two months of light duty

work, and subsequently offered her additional light duty work when a new project arose, the court concludes that no reasonable trier of fact could find that defendant retaliated against plaintiff for a charge of discrimination she filed in March 2011. Consequently, defendant is entitled to summary judgment with respect to Counts III and V.

### B.     Equal Pay Act – Count VI

Defendant contends that plaintiff's equal pay claim fails as a matter of law because plaintiff was paid more than the male comparator. 29 U.S.C. § 206(d)(1) prohibits an employer from "paying wages to employees . . . at a rate *less* than the rate at which [the employer] pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." (Emphasis added). Accordingly, a prima facie case of wage discrimination pursuant to the EPA requires plaintiff to establish that: "'(1) *higher wages* were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions.'" Warren v. Solo Cup Co., 516 F.3d 627, 629 (7th Cir. 2008) (quoting Stopka v. Alliance of Am. Insurers, 141 F.3d 681, 685 (7th Cir. 1998) (emphasis added)). The record, however, establishes that Sergeant Collins – the only male comparator plaintiff relies on in support of her EPA claim – made less than plaintiff throughout his employment with defendant.[13] Plaintiff herself conceded during her deposition that she earned more than Collins, and that her equal pay claim is based on her belief that the difference between their pay should have been greater in light of her longer

---

[13] As noted earlier, the court will not consider plaintiff's later-filed declaration that directly contradicts her deposition testimony.

tenure with defendant.  Because plaintiff has not submitted any evidence that a male employee with substantially similar skills and responsibilities was paid more than she, plaintiff does not have a viable claim pursuant to the EPA.

**<u>CONCLUSION</u>**

For the foregoing reasons, the court grants defendant's motion (doc. 65) for summary judgment and enters judgment in favor of defendant Northwestern University, and against plaintiff Martinez.


**ENTER:**          **March 29, 2016**

**Robert W. Gettleman**
**United States District Judge**